1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney

2

3   THOMAS A. COLTHURST (CABN 99493)
    Chief, Criminal Division

4   JARED S. BUSZIN (NYBN 5285838)
    Assistant United States Attorney

5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7199
7       Fax: (415) 436-7234
        Jared.Buszin@usdoj.gov

8
    Attorneys for United States of America
9
                        UNITED STATES DISTRICT COURT
10
                     NORTHERN DISTRICT OF CALIFORNIA
11
                            OAKLAND DIVISION
12

13  UNITED STATES OF AMERICA,            )   **CASE NO. 4:23-CR-187-JSW**
                                         )
14          Plaintiff,                   )   **MEMORANDUM IN SUPPORT OF UNITED**
                                         )   **STATES' MOTION FOR DETENTION**
15      v.                               )
                                         )
16  MAXFER PALMA                         )   Date:  July 13, 2023
                                         )   Time:  10:30 a.m.
17          Defendant.                   )   Court: Hon. Kandis A. Westmore
                                         )
18

19

20

21

22

23

24

25

26

27

28

    UNITED STATES' DETENTION MEMORANDUM    1
    4:23-CR-187-JSW

**INTRODUCTION**

Defendant Maxfer Palma, a 29-year-old Honduran national, was arrested by Oakland police officers on April 11, 2023 after a search of his apartment led to the seizure of more than ***200 grams of fentanyl and more than 2 kilograms of pure methamphetamine***, along with a ghost gun, several rounds of ammunition, and two magazines, as shown below.



After his arrest, the defendant participated in a mirandized, recorded interview and admitted that a black backpack found at the residence—which contained the firearm, ammunition, fentanyl, and more than 400 grams of pure methamphetamine—belonged to him.[1]  The defendant also told officers that he had been selling drugs in San Francisco for several months.

True to those admissions, on April 22, 2023—a mere 11 days after the search of his Oakland residence—the defendant was arrested by San Francisco police officers in the vicinity of Golden Gate

---

[1] These items recovered from Palma's black backpack are enclosed in the two red rectangles in the picture above.

UNITED STATES' DETENTION MEMORANDUM    2
4:23-CR-187-JSW

1   Avenue and Hyde Street in the Tenderloin after he was observed trafficking narcotics.  A search of the

2   defendant's "bag man"[2] led to the seizure of approximately 166.5 grams (gross) of fentanyl and 13

3   grams (gross) of methamphetamine, along with a loaded ghost gun and other indicia of drug distribution.

4        After these events, a federal grand jury returned an indictment charging the defendant with three

5   counts of drug trafficking in connection with the April 11 incident.[3]  Counts One and Three carry

6   mandatory minimum sentences of ten and five years, respectively.  Count Two carries a mandatory

7   consecutive sentence.  Upon conviction, the defendant is likely to receive a sentence of at least ten

8   years' imprisonment, particularly since his possession of a firearm and related admissions preclude

9   safety valve as a viable option.

10        In this case, the defendant must overcome a rebuttable presumption that no condition or

11   combination of conditions will reasonably assure his appearance and the safety of the community.  The

12   record demonstrates that he cannot rebut that presumption.  Accordingly, the government respectfully

13   requests that the Court order the defendant be detained pending trial.

14   **I.**     **FACTUAL BACKGROUND**

15        **A.**     **Police Seize Drugs and a Firearm from the Defendant's Residence While Investigating a Brutal Pistol-Whipping Incident**

16

17        On March 13, 2023, Oakland Police Department ("OPD") officers responded to reports of

18   gunshots and found two victims ("Victim One" and "Victim Two") bleeding profusely from their heads

19   outside of an Oakland residence.  Victim Two told officers that she had been asleep in bed when she

20   heard knocking and yelling at the front door of the residence where she was sleeping.  The front door

21   was then forced open and approximately five individuals dressed in black, two of whom had firearms,

22   entered the residence.  Victim Two was struck on the back of the head by one of the intruders and fell to

23   the ground, where she witnessed the men assault Victim One.  Victim One, who was rendered

24   unconscious from the beating, provided a similar description of events to OPD officers after he awoke in

25   the hospital.  Victim Two told OPD officers that she recognized the voices of three of the assailants.

26

27        [2] To avoid law enforcement detection, narcotics traffickers operating in the Tenderloin and elsewhere often enlist another person, known as a bag man, to hold their narcotics and other incriminating items.

28        [3] As discussed further below, the evidence indicates that the defendant continued to sell narcotics in the Tenderloin after both of his April 2023 arrests.

UNITED STATES' DETENTION MEMORANDUM    3
4:23-CR-187-JSW

1   One of those three individuals was the defendant, who Victim Two identified as one of the intruders

2   with a firearm.  Victim Two provided officers with a suspected address for the defendant—6506 Foothill

3   Boulevard, Apartment A (the "Foothill Residence")—which was later corroborated by surveillance.[4]

4        On April 11, 2023, OPD officers executed warrants to arrest the defendant and search the

5   Foothill Residence for firearm-related evidence.  Before executing the warrants, officers called for the

6   occupants of the Foothill Residence to come outside and multiple people did so, including two young

7   girls estimated to be about 4-5 years old and 10 years old, respectively.  The defendant was the last

8   person to exit the front of the residence,[5] and he was detained without incident.

9        During their search of the residence, officers found indicia for the defendant in one of the two

10  bedrooms.  In the closet of that bedroom, officers found a black backpack hidden in a laundry hamper.

11  A search of the backpack revealed (i) a ghost gun; (ii) four rounds of live 9mm ammunition; (iii) a

12  digital scale; (iv) a large bag of suspected methamphetamine; and (v) a smaller gray case containing

13  suspected fentanyl.  While searching the living room, officers located four bricks of suspected

14  methamphetamine concealed in a green backpack that had been placed inside a dog crate, which was

15  occupied at the time by a small dog.  Officers also found an additional firearm magazine in the living

16  room, as well as some suspected cocaine base.  The décor and other items in the Foothill Residence

17  suggested that one or more juveniles were living there.  With respect to the seized narcotics, subsequent

18  testing by the DEA determined that the black backpack contained at least 207 grams (net) of fentanyl

19  and at least 410 grams (net) of pure methamphetamine, while the green backpack contained at least

20  1,638 grams (net) of pure methamphetamine.

21       In a mirandized, recorded interview with officers after his arrest, the defendant stated that the

22  black backpack officers had seized belonged to him.  When asked what was inside the backpack, the

23  defendant volunteered that it contained drugs, namely fentanyl.  He further confirmed there was a white

24  and gray firearm inside the backpack and, when shown a picture of the ghost gun officers had found,

25  admitted that it was his.  The defendant told officers he had been selling drugs in San Francisco for

26

27  [4] The 6506 Foothill Boulevard address appears to correspond to the address where both the defendant's proposed sureties reside.  Dkt. 8 at 2-3.

28  [5] A third juvenile, who shares the same last name as one of the defendant's proposed sureties, was detained after officers observed him jump out of a rear window of the residence.

1    about three months and that he carried the gun with him (purportedly unloaded) while doing so.

2    **B.    The Defendant Is Arrested in the Tenderloin on Narcotics and Firearms Charges Eleven Days After His Initial Arrest**

3

4    On April 22, 2023, plainclothes SFPD officers observed the defendant approach a bag man who

5    was sitting in a parklet in the vicinity of Golden Gate Avenue and Hyde Street.  Officers witnessed the

6    defendant retrieve suspected narcotics from the bag man and provide them to a customer, who

7    proceeded to place the suspected narcotic in a glass pipe and smoke it.  Officers detained both the

8    defendant and the bag man.  A search of the bag man resulted in the seizure of a black backpack, a black

9    fannypack, and a reusable shopping bag.  Further search of these bags revealed (i) 166.5 grams (gross)

10   of suspected fentanyl; (ii) 13 grams (gross) of suspected methamphetamine; (iii) plastic baggies; (iv)

11   three functional digital scales; (v) a gray and black fully loaded Polymer 80 9mm pistol with a 6-round

12   magazine; and (vi) miscellaneous suspected narcotics.

13    

Seized Narcotics and Related Evidence        Firearm and Ammunition

14

15

16

17

18

19

20

21   TruNarc testing of the suspected fentanyl and methamphetamine yielded presumptive positive results.

22   The bag man and the defendant both provided mirandized statements to officers after their arrest.

23   The bag man told officers that he owed money to the defendant and another individual and was holding

24   narcotics for them,[6] though he claimed to have no knowledge of the firearm.  The defendant falsely told

25   officers that he had been in the area drinking beer with a friend and did not possess or sell narcotics or

26   possess a firearm.  He claimed that he had never sold or been arrested for selling narcotics,

27

28   _____
     [6] The bag man admitted that some of the narcotics seized by law enforcement belonged to him and were for his personal use.

1  notwithstanding his arrest just eleven days prior.

2  **C.      The Defendant Is Taken Into Federal Custody After Being Arrested in San**
3  **Francisco While in Possession of Fentanyl and Methamphetamine**

4  On July 6, 2023, SFPD officers were conducting surveillance in Oakland in connection with a

5  search warrant operation involving two other drug trafficking targets.  Officers observed those targets

6  and a third person drive a BMW vehicle to the vicinity of the defendant's 6506 Foothill Boulevard

7  residence, where they picked up the defendant, who was carrying a black backpack.  SFPD officers

8  followed the BMW and its four occupants as they traveled to San Francisco, where they were seen

9  parking the vehicle just west of the Tenderloin.  As all four individuals began walking toward the

10  Tenderloin, officers moved in and detained them.  A K-9 at the scene alerted to the defendant's

11  backpack, which was subsequently searched and found to contain suspected narcotics.  After his arrest,

12  the defendant participated in a mirandized interview and admitted that his backpack contained

13  approximately 40 grams of fentanyl and 40 grams of methamphetamine.  He also admitted that he knew

14  fentanyl was deadly.  He lied to officers again regarding the scope of his narcotics trafficking, saying

15  this time that he had only been selling narcotics for about two weeks.

16  **D.      The Defendant Is a Honduran Citizen with Multiple Convictions Outside the Bay**
17  **Area**

18  The defendant is a Honduran national whose first immigration contact with U.S. authorities was

19  in June 2012.  In the time since then, he has been prosecuted and convicted twice in the District of

20  Arizona for illegally reentering the United States, with the second such conviction constituting a felony.

21  *See* 8 U.S.C. § 1325.  He was also charged with a narcotics offense in connection with the second of

22  those prosecutions. Dkt. 8 at 6.  The defendant was convicted in Utah in 2016 for possessing/using a

23  controlled substance.

24  **II.      LEGAL STANDARD**

25  Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail

26  where "no condition or combination of conditions will reasonably assure the appearance of the person as

27  required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is

1    appropriate where a defendant is either a danger to the community or a flight risk; the government need

2    not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

3    A finding that a defendant is a danger to the community must be supported by clear and convincing

4    evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the

5    evidence. *Id.*

6         "[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated

7    in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).

8    Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence

9    against the defendant; (iii) the history and characteristics of the defendant, including the defendant's

10   character, physical and mental condition, family and community ties, past conduct, history relating to

11   drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well

12   as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature

13   and seriousness of the danger to any person or to the community that would be posed by the defendant's

14   release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

15        Where there is probable cause that a defendant has violated the Controlled Substances Act and

16   faces a maximum of 10 years in prison or more (as here), courts apply a rebuttable presumption that no

17   condition or combination of conditions will reasonably assure the defendant's appearance as required

18   and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of

19   production shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although

20   the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-

21   83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810

22   (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence,

23   "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question

24   without reference to the presumption." *Id.* (further stating that such an approach would "render the

25   presumption virtually meaningless" because a defendant can "always provide the magistrate with *some*

26   reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased;

27   instead, it remains in the case as an evidentiary finding militating against release that is to be weighted

28   along with other relevant factors. *See United States v. King*, 849 F.2d 485 (11th Cir. 1988); *accord*

UNITED STATES' DETENTION MEMORANDUM       7
4:23-CR-187-JSW

1  *United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

2  **III.    ARGUMENT**

3  **A.    The Defendant Faces a Rebuttable Presumption in Favor of Detention**

4  The defendant is charged with two violations of 21 U.S.C. § 841(a)(1) and each of those counts

5  carries a statutory maximum penalty of more than ten years' imprisonment.  As a result, there is a

6  rebuttable presumption that no condition or combination of conditions will reasonably assure the

7  defendant's appearance as required and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).

8  As described below, the defendant cannot overcome this presumption.

9  **B.    The Defendant Cannot Overcome the Presumption That He Is a Flight Risk**

10  A preponderance of the evidence establishes that the defendant presents a flight risk absent

11  pretrial detention.  In light of his mirandized admissions and the significant quantity of

12  methamphetamine and fentanyl seized at his residence, the defendant faces near certain conviction on

13  the charged offenses and is looking at a lengthy federal sentence of no less than ten years' imprisonment

14  and possibly much more.  Indeed, the government's preliminary analysis suggests that the defendant's

15  advisory Guidelines sentence will be 262-327 months' imprisonment based solely on the conduct

16  underlying the charged offenses.  A possible sentence of this length presents the defendant with a strong

17  incentive to flee.  *See United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (strong evidence of

18  guilt "makes it more likely that he will flee").  This is particularly true where the defendant faces a real

19  possibility of further charges.

20  The record suggests that the defendant has not only the motive but also the means to flee.  He is

21  a Honduran national with few longstanding ties to this District and a review of his cell phone revealed

22  numerous recent contacts between the defendant and individuals with Honduran phone numbers, as well

23  as evidence of money transfers made to Honduras in recent months.  The defendant has two children

24  back in Honduras and purportedly remains in a relationship with the mother of one of those children,

25  who is also back in Honduras.  Dkt. 8 at 4.  His prior conviction in Utah also suggests he has ties to

26  other communities in the United States outside of this District, to which he might flee to avoid

27  prosecution.

28

UNITED STATES' DETENTION MEMORANDUM      8
4:23-CR-187-JSW

**C.**     **The Defendant Cannot Overcome the Presumption That He Is a Danger to the Community**

Pretrial detention is also appropriate because clear and convincing evidence demonstrates that the defendant poses a danger to the community.  The defendant admitted to law enforcement that he makes his living selling dangerous drugs, including fentanyl, which he knows to be deadly.  *See, e.g.*, *United States v. Alfonso Ramos*, No. 3:20-mj-71799-MAG-1 (EJD), 2020 U.S. Dist. LEXIS 244831, at *7 (N.D. Cal. Dec. 29, 2020) (sale of approximately 227 grams of fentanyl showed defendant posed a danger to the community because "[f]entanyl is among the most dangerous and deadly illegal drugs").  The distribution of fentanyl continues to have deadly results and is currently driving a surge in accidental overdose deaths in San Francisco that is outpacing the hundreds of such annual deaths that have been tracked in recent years.[7]  If released, it is foreseeable that the defendant will continue to support himself the way he has been—by selling fentanyl and other drugs.  His arrest in the Tenderloin so soon after his arrest in Oakland is telling, as is his most recent arrest.  Furthermore, the danger posed by the defendant goes beyond his narcotics trafficking.  The record demonstrates that the defendant has access to multiple firearms and is willing to use them, as reflected by the March 13 pistol-whipping incident.

## CONCLUSION

For the reasons stated above, there is no set of conditions that will reasonably assure the appearance of the defendant at court proceedings or ensure the safety of the community.  The Court should therefore order the defendant detained pending trial.

DATED:  July 11, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


*/s/ Jared Buszin*_____
JARED S. BUSZIN
Assistant United States Attorney

---

[7] Yoohyun Jung, *74 People Died in May in San Francisco from Accidental Overdoses*, S.F. Chron., June 15, 2023 (https://www.sfchronicle.com/projects/2021/san-francisco-drug-overdoses-map/).  San Francisco is on pace to have 830 accidental overdose deaths in 2023.  *Id.*